ATTORNEYS FOR APPELLANTS
James P. Fenton
Alan VerPlanck
Kathryn A. Brogan
Fort Wayne, Indiana

ATTORNEYS FOR AMICUS CURIAE
WILLIAM N. STANT
James Alexander Tanford
Bloomington, Indiana

Rudolph Wm. Savich
Bloomington, Indiana

ATTORNEYS FOR APPELLEES
INDIANA FINANCE AUTHORITY
Phillip R. Scaletta
Michael A. Wukmer
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
INDIANA DEPARTMENT OF TRANSPORTATION
MITCHELL E. DANIELS, GOVERNOR OF
INDIANA, AND TIM BERRY, TREASURER OF
INDIANA
Steve Carter
Attorney General

Thomas M. Fisher
Solicitor General

Julie A. Hoffman
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
STATEWIDE MOBILITY PARTNERS AND
ITR CONCESSION
Jeffrey C. McDermott
Libby Y. Mote
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA ASSOCIATION OF CITIES & TOWNS
Michael A. Howard
Noblesville, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 71S00-0606-CV-204

STEVE BONNEY, JOHN GIBSON, ANITA
GIBSON, TOM PIETRZAK, RANDY NACE,
CLARINDA NACE, JUNE NACE , AND THE
CITIZENS ACTION COALITION OF INDIANA,
INC., AN INDIANA NOT FOR PROFIT CORP.,

　　　　　　　　　　　　　　　　　　*Appellants (Plaintiffs below),*

v.

INDIANA FINANCE AUTHORITY, STATEWIDE

MOBILITY PARTNERS, LLC, ITR CONCESSION
COMPANY, LLC, THE INDIANA DEPARTMENT OF
TRANSPORTATION, MITCHELL E. DANIELS,
GOVERNOR OF INDIANA, AND TIM BERRY,
TREASURER OF INDIANA,

*Appellees (Defendants below).*

---

Appeal from the St. Joseph Superior Court, No. 71D07-0604-PL-00144
The Honorable Michael P. Scopelitis, Judge

---

On Petition To Transfer Pursuant to Indiana Appellate Rule 56(A)

---

**June 20, 2006**

**Boehm, Justice.**

The plaintiffs contend that the 2006 law commonly referred to as the "Major Moves" legislation violates several provisions of the Indiana Constitution. The trial court determined that:

1) the claims raised in most counts of the complaint in this case are governed by the Public Lawsuit Statute;
2) the plaintiffs' challenges presented no substantial issue, and therefore the Public Lawsuit Statute requires that a bond be posted before the claims governed by that Statute may proceed;
3) the claims raised in Counts IV and VIII were severable from the remainder of the complaint and were not governed by the Public Lawsuit Statute; and
4) the amount of the potential loss to the public from the pendency of this lawsuit was approximately $1.9 billion.

Accordingly, the trial court ordered that the Public Lawsuit portions of the complaint be dismissed unless the plaintiffs posted a bond in that amount.

The plaintiffs appeal that order, raising five issues. They contend that this lawsuit is not subject to the Public Lawsuit Statute for two reasons:

1) the Indiana Finance Authority is not a "municipal corporation" as that term is used in the statute; and
2) the statute applies only to acquisitions, not dispositions, of public works.

2

Plaintiffs also contend that even if the Public Lawsuit Statute applies to their claims, that statute permits a lawsuit to go forward without a bond if the plaintiffs present substantial issues for trial. Plaintiffs contend they have presented three substantial challenges to House Enrolled Act 1008 under the Indiana Constitution:

1) the provisions granting funding to seven counties constitute "special" legislation in violation of Article IV, Section 23;
2) the provisions for the proceeds of the lease of the Indiana Toll Road to be applied to purposes other than retirement of "public debt" violate Article X, Section 2; and
3) the exemption of the Toll Road from property taxes violates the requirement of Article X, Section 1 that the system of taxation be "uniform and equal" subject only to exemptions for specified purposes.

The first two contentions turn solely on the language of the Public Lawsuit Statute, and we conclude that the General Assembly intended the statute to apply to lawsuits such as this. We also conclude that no substantial issue is raised by the plaintiffs' three contentions that HEA 1008 violates the Indiana Constitution. The trial court's decision as to the severability of counts IV and VIII is not challenged on appeal. Accordingly, we affirm the order of the trial court.

**Facts and Procedural History**

The Indiana Toll Road runs through the seven Indiana counties along Michigan's southern border. The road is a major artery connecting Chicago and points west with destinations in the Northeast. It was originally constructed in the 1950s by the Indiana Toll Road Commission, which is a predecessor of one of several statutory entities that were consolidated to form the Indiana Finance Authority (IFA) in 2005. As a result of that consolidation, IFA is the current owner of the road.

In 2005 IFA began to explore leasing the Toll Road to a private entity and ultimately it solicited bids from potential lessees through an auction process. The ITR Concession Company LLC (ITR) submitted the highest bid of $3.8 billion. The transaction was contingent upon authorizing legislation, and Governor Daniels signed House Enrolled Act 1008 (HEA 1008), popularly known as "Major Moves," into law in late March 2006. On April 12, 2006, ITR and IFA executed the "Indiana Toll Road Concession and Lease Agreement." Pursuant to its terms, IFA agreed to terminate the current lease to the Indiana Department of Transportation (INDOT) and

to lease the toll road lands and facilities to ITR for a term of seventy-five years. ITR agreed to pay rent in the amount of $3.8 billion to be paid in full on the date of closing.

HEA 1008 includes a number of provisions addressing the use of the lease proceeds. The Act directs that any lease proceeds first be applied to retire IFA's existing bond debt and to pay any expenses incurred by IFA in connection with the execution and performance of the lease. After payment of these obligations, IFA is to allocate $500 million to a "Next Generation Trust Fund" and the remainder to a "Major Moves Construction Fund." The Next Generation Trust Fund is a charitable trust created by the Act to fund long-term road, highway, and bridge projects. Money in the Major Moves Construction Fund is allocated first in specific amounts to the seven counties that the Toll Road traverses. The five counties at the eastern end of the Toll Road (Steuben, LaGrange, Elkhart, Saint Joseph, and LaPorte) are each to receive $40 million. Lake and Porter counties each would receive a smaller allocation because these two counties are members of the Northwest Indiana Regional Developmental Authority, which receives separate distributions totaling $120 million. The Act also provides that total distributions from the Major Moves Fund for projects or purposes benefiting the seven northern counties may not be less than 34% of the lease proceeds after two adjustments. The Act allocates $179 million to the state highway fund for preliminary engineering, purchase of right-of-ways, or construction of highways and bridges, and $150 million to the motor vehicle highway account. In addition to these specific required allocations, the Act authorizes additional distributions from the Major Moves Fund to the state highway fund for funding any project in INDOT's transportation plan. Based on testimonial evidence presented by the defendants, the trial court made a factual finding that the largest portion of the Major Moves money is allocated to INDOT to complete its ten-year plan, which includes upgrades to U.S. Highway 31, and construction of the Ports to Ports Road, the Hoosier Heartland Highway, and the Interstate 69 extension into southern Indiana.

On April 12, 2006 the plaintiffs filed their complaint in St. Joseph Superior Court seeking a declaratory judgment and a permanent injunction invalidating HEA 1008 on a variety of state constitutional grounds. The complaint named as defendants the IFA, Mitch Daniels, in his official capacity as Governor of Indiana, Tim Berry, in his official capacity as Treasurer of Indiana,

4

INDOT, ITR, and Statewide Mobility Partners, LLC (SMP).[1]  Under section 9.1(g) of the Lease Agreement IFA made the following representation and warranty to ITR:

> There is no action, suit or proceeding, at law or in equity, or before or by any Governmental Authority, pending nor, to the best of IFA's knowledge, threatened against the IFA, which would have a Material Adverse Effect on (i) the operations of the Toll Road or (ii) the validity or enforceability of this Agreement.

If there is any such litigation pending on June 30, 2006, the date of closing, and the failure to close is not attributable to ITR, the Lease Agreement authorizes ITR to terminate the Agreement and seek indemnification from IFA for any losses occasioned by IFA's breach of this warranty.

Expressing concern that the plaintiffs' complaint might trigger section 9.1(g) of the Lease Agreement, the defendants petitioned the court to certify the plaintiffs' complaint as a public lawsuit under Indiana's Public Lawsuit Statute or alternatively to dismiss the complaint.  After a hearing held May 11 and 15, 2006, the court issued an order certifying as a public lawsuit Counts I, II, III, V, VI, and VII and the portion of Count IV challenging the establishment of local construction funds and the transfer of highway operations.   The court required plaintiffs to post a bond to cover anticipated damages and costs of the public lawsuit to the defendants if the defendants ultimately prevail.  The amount of the bond was set at $1.9 billion,[2] and the plaintiffs were required to post the bond within ten days of the order or risk dismissal with prejudice of their certified counts.  The court concluded that the portion of Count IV challenging provisions of HEA 1008 related to the proposed construction of Interstate 69 and Count VIII were severable from the remaining claims and therefore did not threaten the validity of the Act or Lease Agreement.  These were permitted to proceed without bond.

Plaintiffs appealed the order to the Court of Appeals on June 5, 2006.  The same day, on defendants' motion, this Court accepted jurisdiction over the appeal under Indiana Appellate Rule 56(A).

---

[1] ITR made its bid on behalf of SMP.  SMP is a joint venture for Cintra Concesiones de Infraestructuras de Transporte, SA and Macquarie Infrastructure Group.

[2] The trial court determined defendants' anticipated damages and losses to be the difference between the $3.8 billion rental payment under the proposed Lease Agreement and the estimated value of the Toll Road for the next seventy-five years if operated by IFA.  Defendants' expert testified that the value of the Toll Road for the next seventy-five years if operated by IFA would be $1.92 billion.  The court used this figure to calculate defendants' anticipated damages and losses and rejected the alternative $5.35 billion figure offered by plaintiffs' expert.

Complaints challenging the Act and the Lease Agreement were filed by other plaintiffs in LaPorte and Brown counties. The LaPorte County complaint was dismissed with prejudice on June 8, 2006. After we accepted jurisdiction over this case, William Stant, the Brown County plaintiff, moved for leave to appear as an amicus curiae. That motion was granted, as was the motion of the Indiana Association of Cities and Towns.

## I.  Application of the Public Lawsuit Statute

The Public Lawsuit Statute, Indiana Code sections 34-13-5-1 through 34-13-5-12 (2004), has been in place since 1967. It reflects the General Assembly's recognition that the mere pendency of a lawsuit can frustrate a project even if the claims are eventually found to be without merit. The statute acknowledges that litigation can be deployed to delay and sometimes even defeat public projects, and can be driven by a variety of motivations, some of which may have little to do with the merits of the project from the perspective of the general public.[3] Indeed the testimony of these plaintiffs offers interesting anecdotal evidence on that point. The trial court found that one plaintiff opposed HEA 1008 because he owns a farm in Greene County (presumably approximately 200 miles from the Toll Road) and does not want the proposed extension of Interstate 69 from Indianapolis to Evansville to go forward through his land. Of course these plaintiffs, and all citizens, have every right to deploy whatever tools the law gives them to challenge legislation with which they disagree for whatever reason. But the General Assembly has prudently provided for a means of quickly separating the legal wheat from the chaff to prevent opponents of a public project from achieving by the passage of time more than the law would give them.

The statute imposes a number of procedural rules governing public lawsuits, including provisions that are designed to consolidate all litigation in one forum and the requirement that a

---

[3] The purpose of the statute "is to protect the public against a 'flood of harassing litigation' which obstructs and delays public improvement at prohibitive costs and from the 'financial damage of completely non-meritorious litigation.'" Johnson v. Tipton Comty. Sch. Corp., 253 Ind. 460, 464, 255 N.E.2d 92, 94 (1970) (quoting State ex rel. Haberkorn v. DeKalb Circuit Court, 251 Ind. 283, 288, 241 N.E.2d 62, 65 (1968)). See also Jay M. Zitter, Annotation, Constitutionality, Construction, & Application of Statutes Requiring Bond or Other Security In Taxpayers' Action, 41 A.L.R. 5th 47, 2a (1996).

bond be posted if, as occurred in this case, the trial court determines that the claims do not meet the statutory requirements to avoid the bond request.

"Public lawsuit" is defined by statute as:

(1) any action in which the validity, location, wisdom, feasibility, extent, or character of construction, financing, or leasing of a public improvement by a municipal corporation is questioned directly or indirectly, including but not limited to suits for declaratory judgments or injunctions to declare invalid or to enjoin the construction, financing, or leasing; and

(2) any action to declare invalid or enjoin the creation, organization, or formation of any municipal corporation.

Ind. Code § 34-6-2-124(a).

The plaintiffs contend that their case is not a public lawsuit because the IFA is not a municipal corporation and also because only challenges to the acquisition, not disposition, of public improvements constitute public lawsuits. For the reasons explained below, we disagree with both contentions. Accordingly, we affirm the trial court's certification of the complaint as a public lawsuit.

A. *IFA as a Municipal Corporation*

The plaintiffs argue that their complaint was erroneously certified as a public lawsuit subject to the provisions of the Public Lawsuit Statute because the IFA, as a statewide body, is not a municipal corporation. They point to a number of authorities in which the term "municipal corporation" is used to describe a unit of local government. For purposes of the Public Lawsuit Statute, however, the General Assembly has provided a specific definition:

"Municipal corporation" for purposes of Indiana Code chapter 34-13-5, means a:

(A)   local subdivision of the state; or
(B)   public instrumentality or public corporate body created by state law; including but not limited to cities, towns, townships, counties, school corporations, special taxing districts, conservancy districts, and any other local public instrumentality or corporation that has the right to sue and be sued;

I.C. § 34-6-2-86(1).

7

The IFA is clearly a "municipal corporation" within subsection (B) of this definition because it is created by state law and is both a "public instrumentality" and a "public corporate body." The statute creating IFA so states in plain terms:

> There is created *a body politic and corporate, not a state agency but an independent instrumentality exercising essential public functions*, to be known as the Indiana finance authority.

I.C. § 4-4-11-4(a) (emphasis added).[4] And, of course, this statute is a "state law" as that term is used in the definition of "municipal corporation." Where we have an unambiguous statutory definition it is irrelevant how the term may be customarily used in other contexts. See St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele, 766 N.E.2d 699, 704 (Ind. 2002). Indeed, the General Assembly has defined the term "municipal corporation" differently for different purposes,[5] demonstrating that the only relevant definition for our purposes is the one provided specifically for the Public Lawsuit Statute. Moreover, the definition seems appropriate. We can see no reason, and none is offered, why the General Assembly would choose to provide greater freedom from the risk of extended but ultimately unsuccessful lawsuits to projects of local governments than it affords to projects it specifically authorizes.

The plaintiffs argue that the list of organizations following subsection (B) limits those public instrumentalities and public corporations that are municipal corporations to local public instrumentalities and local public corporate bodies because the list does not include any bodies that operate on a statewide level. But the phrase "including but not limited to" is very familiar to lawyers and undeniably means that what follows is inclusive, not exclusive. Moreover, the use of the term "local" in subsection (A) indicates that subsection (B) is not restricted to "local" entities. We conclude that subsection (B) means what it says: IFA as a "public corporation" and "public instrumentality" is a "municipal corporation."

---

[4] In 2005 section 4(a) was amended to add the following language:
> The authority is separate and apart from the state in its corporate and sovereign capacity, and though separate from the state, the exercise by the authority of its powers constitutes an essential governmental, public, and corporate function.

See P.L. 235-2005 § 10.

[5] See I.C. § 5-1-12-1 ("The term 'municipal corporation' means a county, township, city, town, or school corporation."); I.C. § 36-1-2-10 ("'Municipal corporation' means unit, school corporation, library district, local housing authority, fire protection district, public transportation corporation, local building authority, local hospital authority or corporation, local airport authority, special service district, or other separate local governmental entity that may sue and be sued. The term does not include special taxing district.").

B. *Challenges to Public Improvements*

The plaintiffs argue that the definition of "public lawsuit" in Indiana Code section 34-6-2-124 limits the applicability of the Public Lawsuit Statute to lawsuits challenging the acquisition of public improvements. They contend that "construction" and "financing" are steps in the creation of a public improvement, and therefore the term "leasing" should be interpreted as limited to situations where the municipal corporation is the lessee, and does not include transactions in which the municipal corporation is the lessor disposing of the asset. As plaintiffs contend, "leasing" is ambiguous and may apply to acts of either the lessor or lessee. We think it is unnecessary to resolve that issue because the plaintiffs' argument fails to recognize that the plaintiffs' complaint challenges much more than the "leasing" of the Toll Road. The lawsuit attacks the "validity . . . wisdom, feasibility . . . [and] character" of all of the projects completed by HEA 1008, including the use of the lease proceeds to provide "financing" for a variety of "public improvements" across the state. Thus, even if the Public Lawsuit Statute applies only to the initiation of public improvements as the plaintiffs argue, this lawsuit remains a "public lawsuit."

## II.     Constitutional Claims

In order to avoid the bond requirement the Public Lawsuit Statute provides that the plaintiffs must "establish facts that would entitle the plaintiff to a temporary injunction." I.C. § 34-13-5-7(b). The term "temporary injunction" has been in the statute since 1967, and predates the current Trial Rules' reference to "temporary restraining order" and "preliminary injunction." Ind. Trial Rule 65. We have consistently held that the statute requires the plaintiff in a public lawsuit to demonstrate that there is a "substantial issue to be tried." Marshall County Tax Awareness Comm. v. Quivey, 780 N.E.2d 380, 382 n.4 (Ind. 2002) (citing Hughes v. City of Gary, 741 N.E.2d 1168, 1171 (Ind. 2001); Boaz v. Bartholomew Consol. Sch. Corp., 654 N.E.2d 320, 322-23 (Ind. Tax Ct. 1995); Johnson v. Tipton Cmty. Sch. Corp., 253 Ind. 460, 464-65, 255 N.E.2d 92, 94 (1970)). The trial court determined that none of the several issues raised by the public lawsuit complaint met this test. Plaintiffs appeal, challenging three of those rulings.

A. *Special Legislation*

9

The largest portion of the proceeds from the lease is allocated to INDOT. The plaintiffs do not challenge the provisions allocating money to INDOT, which is an agency of the State, and will determine the amount and purpose of distributions for local projects. Sections 5 and 7, codified at Indiana Code sections 8-14-14-6(a)(3), and 8-14-16-1, create a "Local Major Moves Construction Fund" and allocate some of the lease proceeds to the seven northern counties through which the Toll Road runs. The plaintiffs argue that the General Assembly's decision to appropriate funds to these seven counties constitutes special legislation in violation of Article IV, Section 23 of the Indiana Constitution.

The trial court first held that HEA 1008 is not special legislation because it "is designed to allow the completion of road construction and other projects throughout the entire state." The trial court next held that because the "General Assembly routinely appropriates money to local governments throughout the state based on its policy determinations with regard to local need, including specific designations for highways and local roads," sections 5 and 7 of HEA 1008 are not special legislation. The trial court also held that even if sections 5 and 7 could be characterized as special legislation the circumstances unique to the seven northern counties justify the legislature's choice in apportionment. We think the statute is not special legislation, and do not address the need for justification.

In <u>Municipal City of South Bend v. Kimsey</u>, 781 N.E.2d 683, 685 (Ind. 2003), we noted that the purpose of a constitutional provision against "special legislation" "is 'to prevent state legislatures from granting preferences to some local units or areas within the state, and thus creating an irregular system of laws, lacking state-wide uniformity.'" (quoting Osborne M. Reynolds, <u>Local Government Law</u> 86 (1982)). Article IV, Section 23 reads: "[I]n all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State."

The General Assembly's decision to build a road in one part of the state or provide additional funding because the Toll Road runs through a given county does not make the law special legislation. The threshold question is whether a law is special or general. <u>Kimsey</u>, 781 N.E.2d at 692. If it is "special," the next issue is whether a general law "can be made applicable." <u>Id.</u> A general law cannot "be made applicable" where the law's objective is to support a given project.

10

For example, a law providing for construction of a facility of a state university necessarily has an impact in a single locale, and cannot "be made general." Nor does a law that includes a number of provisions relating to education become special legislation because it also funds a new library at one of the state universities and thereby expends funds in the community where that library is to be located. Similarly, in the present case, the Major Moves legislation that includes allocation of lease proceeds for construction projects throughout the state does not become special legislation because it also makes lump sum allocations to seven Indiana counties. To the extent Article IV of the Indiana Constitution places any constraints on individual projects contained within a larger statewide statute, they are imposed by the single-subject requirement of Article IV, Section 19, not the special legislation provision found in Article IV, Section 23. And plaintiffs correctly do not challenge HEA 1008 under Section 19. Provisions for raising public funds and directing their use are properly contained in the same bill. Bayh v. Ind. State Bldg. & Constr. Trades Council, 674 N.E.2d 176, 179 (Ind. 1996) (Section 19 is "designed to promote fair practice in legislating without much judicial intervention."); Hoovler v. State, 689 N.E.2d 738, 742 (Ind. Ct. App. 1997), trans. denied, 698 N.E.2d 1186, cert. denied, 524 U.S. 905 (specifically approving tax and provisions for spending it).

The determination to fund one project and not another does not violate Article IV, Section 23 for a more fundamental reason. Article X, Section 3 of the Indiana Constitution provides the General Assembly with the power to make appropriations by law. Virtually every appropriation is to some extent arbitrary because there is no principled basis for a court to evaluate the decision of the General Assembly to allocate funds to one purpose over another. For that reason appropriation of funds is a central legislative function unusually unsuitable to judicial review as a matter of separation of powers. See State ex rel. Ind. State Bd. of Fin. v. Marion County Superior Court, 272 Ind. 47, 51, 396 N.E.2d 340, 344 (1979) ("The judicial branch is not at liberty to substitute its judgment for that of the General Assembly in making appropriations and cannot interfere with the clearly expressed appropriations of the legislative branch."); Carr v. State, 127 Ind. 204, 208, 26 N.E. 778, 779 (1891) ("Whether an appropriation shall or shall not be made is a legislative question, and over purely legislative questions the courts have no supervision or control."). This is consistent with the views from other states. As the Supreme Court of Washington put it:

> The separation of powers doctrine ensures that the fundamental functions of each branch of government remain inviolate. The legislative branch generally has control over appropriations. While we may find [the legislature's appropriations decision] to be intolerable, we would find it even more intolerable for the judicial branch of government to invade the power of the legislative branch. . . . While there are special situations when the courts can and should order the expenditure of funds, specific appropriation to fund a statutory right, not involving constitutional rights or judicial functions, is normally beyond our powers to order.

Hillis v. Dept. of Ecology, 932 P.2d 139, 148 (Wash. 1997) (internal citation omitted); accord Bowsher v. Synar, 478 U.S. 714, 763 (1986) (White, J., dissenting) ("[A]ppropriating funds is a peculiarly legislative function, and one expressly committed to Congress by Art. I, § 9."); Cal. Ass'n. of Retail Tobacconists v. State, 135 Cal. Rptr. 2d 224, 246 (Cal. Ct. App. 2003) (finding legislature's policy decisions when appropriating funds and setting spending priorities from its tobacco tax revenue did not violate state constitution); State ex rel. Harrell v. Cone, 177 So. 854, 873 (Fla. 1938) (holding legislature's allocation of road funds did not violate state constitution because the wisdom, economy and policy of statutes are for legislative decision); Bilyk v. Chicago Transit Auth., 531 N.E.2d 1, 4 (Ill. 1988) (refusing to question the legislature's decision as to how to best allocate the funds available to subsidize public transportation); Burnham v. Beverly, 35 N.E.2d 242, 243 (Mass. 1941) ("The necessity or expediency of the exercise of eminent domain is a legislative function, but whether the purpose is a public one is subject to judicial review."); Claremont Sch. Dist. v. Governor, 703 A.2d 1353, 1361 (N.H. 1997) (Horton, J., dissenting) (judges are not "social engineers"); Mt. Horeb Cmty. Alert v. Vill. Bd. of Mt. Horeb, 665 N.W.2d 229, 238 (Wis. 2003) ("The appropriation of funds for municipal construction projects is a central legislative function.").

Moreover, appropriation bills have a statewide effect because the funds are available for allocation by the General Assembly on a statewide basis. The laws we have found to be "special" operated in only one area, typically a county, and the constituents of most legislators who supported those had no interest in the passage or failure of those bills. An appropriation does not suffer from that defect because legislators who support an appropriation are accountable to their own voters for the effect on the public purse. Article IV reflects concern for bad policy choices that result from local laws passed by legislators whose constituents are indifferent to a bill that affects only others. Kimsey, 781 N.E.2d at 686; Reynolds, supra at 86; 1 Charles Kettleborough, Constitution Making in Indiana 195 (Ind. Historical Bureau ed. 1971) (1916). Spe-

cial legislation was also condemned on the ground that attention to local issues diverted the legislature from matters of concern to the general public. 2 <u>Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana</u>, 1768-72, 1813-16 (1850). HEA 1008 suffers from neither of these defects. Its impact is statewide, and inclusion of some local effects in a bill of general statewide significance does not render the bill a special law.

The plaintiffs also complain that there is no rational basis for the selection of the counties to which direct appropriations are made. Because the law is not "special" there is no need to justify the classification. To the extent, however, that this is in substance an equal privileges claim, and not a special legislation claim, no claim is raised in this appeal based on Article I, as opposed to Article IV. In any event, the trial court found that the added burden on local traffic from increased tolls was a sufficient justification for additional funding to the seven counties. It would seem that the potential financial burden on the citizens of these counties would also suffice. Plaintiffs argue that there is no showing that the use of the Toll Road is disproportionately higher by residents of the northern counties. It may be true that there is no hard data on this point, but we cannot say that it is irrational for the General Assembly to make that assumption. <u>See</u> <u>Lake County Clerk's Office v. Smith</u>, 766 N.E.2d 707, 713 (Ind. 2002) ("In determining whether a statute complies with or violates Article I, Section 23, courts must exercise substantial deference to legislative discretion."); <u>see also</u> <u>Ledbetter v. Hunter</u>, 842 N.E.2d 810, 813 (Ind. 2006); <u>Martin v. Richey</u>, 711 N.E.2d 1273, 1280 (Ind. 1999); <u>Collins v. Day</u>, 644 N.E.2d 72, 79-80 (Ind. 1994).

The plaintiffs also argue that the money given to the seven counties can be used "for economic development projects," which could include construction of improvements other than highways, roads and bridges. This permits a different prioritization than that imposed as to other counties. With respect to funding, HEA 1008 provides for general road improvements. The allocations to the seven counties in view of their unique relationship to the Toll Road is in addition to, not in lieu of, the INDOT allocation function. It raises no constitutional issue that this funding may be handled differently, given that the basis for the allocation is different.

B. *Retirement of "Public Debt"*

Article X, Section 2 of the Indiana Constitution provides that "the revenues derived from the sale of any of the public works belonging to the State, and from the net annual income thereof, . . . shall be annually applied, under the direction of the General Assembly, to the payment of the principal of the Public Debt." Plaintiffs contend that HEA 1008 violates this Section because the statute does not apply the proceeds of the lease to the retirement of a variety of obligations that it contends are "public debt" within the meaning of that Section. We conclude that the trial court correctly ruled that there is no longer outstanding any "Public Debt" to which that Section refers.[6]

All parties agree that at the time of the 1850 Constitutional Convention, the State was still reeling from the fallout of the financial collapse of a number of major public works that had been financed with debt that remained the obligation of the State of Indiana and was estimated to require decades to pay off. 1 Debates, supra at 228; Donald F. Carmony, Historical Background of the Restrictions Against State Debt in the Indiana Constitution of 1851, 47 Ind. Mag. of Hist. 129, 310 (June 1951). The State argues that a number of steps were taken in Article X to address this. Among them was Section 2, which was adopted in order to prioritize retirement of this state obligation by requiring available funds to be dedicated to that purpose. In addition, Article X, Section 5 of the Constitution was among several provisions designed to prevent the State from ever again incurring the sort of burdensome debt that it faced at mid-nineteenth century. That Section provides that "No law shall authorize any debt to be contracted, on behalf of the State" with exceptions such as repelling invasion not relevant here. The State argues that the "public debt" to which Section 2 refers is the outstanding debt as of the adoption of the 1851 Constitution. That debt has long since been retired and, by virtue of Section 5, no new "state debt" has been incurred. So, the State argues, since 1915 there has not been any "public debt" to which Section 2 refers, and in particular the debt the plaintiffs cite is not subject to Section 2.

We agree with the defendants that the "public debt" subject to Section 2 is only debt of the State itself. Because there is no longer any such debt to retire, Section 2 presents no constitu-

---

[6] The parties also debated at length in the trial court whether the transaction between IFA and ITC was a "sale" for purposes of Article X, Section 2. At the time this provision in the Constitution was written, the state had a number of revenue generating projects. Section 2 requires "net income" from public works as well as the proceeds of sales of public works to be applied to retire "public debt." For that reason, we do not believe whether the transaction is a sale or a lease to be dispositive of plaintiffs' contention that the statute violates Section 2.

14

tional barrier to HEA 1008. The plaintiffs point to debt of local units of government and debt of public instrumentalities such as IFA that they contend is required to be retired before any proceeds of the lease can be applied to the purposes specified by HEA 1008. Both are forms of "public debt" in some lay sense of the term, but neither is an obligation of the State, and therefore neither is "public debt" as that term is used in Section 2. We first observe that a requirement to retire debt seems of little use unless there is also a prohibition against issuing new debt, and only the State itself is prohibited from issuing new debt. Depending on interest rates and a variety of other factors, it may be prudent to retire existing debt. Indeed, HEA 1008 requires that IFA use the lease proceeds to retire its own debts. But, as explained below, the Constitution imposes no bar to IFA's issuing new debt. And local units of government are subject to the requirements of Article XIII that total debt not exceed "two per centum on the value of the taxable property," but are not prohibited from issuing new debt within that limitation.

A search for the terms "public debt" and "state debt" in the Debates of the Constitutional Convention of 1850 reveals that each of these terms appears over one hundred times.[7] It is obvious that the precarious state of the State's finances was at the forefront of the framers' considerations throughout the convention. And we think it equally obvious that they did not consider "public debt" to be different from "state debt." There are many examples of the interchangeable use of the two terms. Here is one delegate's version of what was to be accomplished in Article X. The two terms appear in the same excerpt by Delegate Read, explaining both the problem and the proposed solution:

> We have before us just the old question of a public debt. For my own part I am not of that school which believes a public debt a public blessing.
>
> Sir, if there is any question settled by the people of Indiana, it is this, that they will pay off the debt which now hangs over them, and by this new Constitution forever prohibit the contracting of a new one, except in the single case of insurrection or invasion by an enemy. This I believe to be distinctly the voice of the people of Indiana, and until this evening I had not supposed that there were five men in this Convention who would vote for the power of creating a State debt in any manner, or under any form, or for any purpose.

Debates, supra at 659-60 (Delegate Read, Monroe).

---

[7] Making of America Books, available at < http://name.umdl.umich.edu/AEW7738.0001.001>.

Some of the debt obligations that the plaintiffs cite are obligations of local units of government—cities, towns, conservancy districts, etc.  Municipal debt is addressed in Article XIII, which limits municipal corporations to two percent of the "taxable property within" the corporation.  There is no suggestion in the debates that municipal debt was the subject of Article X of the Indiana Constitution, and we think it inconceivable that the framers would wish to require that a sale of a state asset would trigger a duty to repay a debt of a unit of local government.  Such a constitutional rule would encourage spendthrift borrowing at the local level in hopes that a state sale would produce a bailout.  Moreover, it plainly would shift the economic benefit of the state's asset from the citizens of the state as a whole to those residents in the local unit.  In short, we think the Indiana Association of Cities and Towns, as amicus curiae, is correct that plaintiffs' reading of Section 2 to require retiring of municipal debt cannot be supported.

The plaintiffs also point to outstanding debt of IFA and its predecessor instrumentalities as "public debt" that Section 2 directs must be retired with the proceeds of the lease.  This contention presents a different issue.  At the time of the 1850 debates, creatures such as IFA were yet to walk the Hoosier landscape.  Only a century later were bonds for capital improvements sought to be issued by instrumentalities that were newly created by state law, and derived their revenues from sources under control of the State, but were not "the State" for purposes of the proscription found in Section 5 against the State's contracting for debt.  Beginning with the Toll Road Commission, several of the entities that now compose IFA had issued bonds to finance specific projects whose revenues were the source of payment of principal and interest on the bonds.  This method of financing public projects was initially challenged on the ground that it amounted to the incurring of state debt in violation of Article X, Section 5.  This contention was rejected as to several of the predecessors of IFA including the Toll Road Commission. See Steup v. Ind. Hous. Fin. Auth., 273 Ind. 72, 76, 402 N.E.2d 1215, 1218 (1980) (Housing Finance Authority); Orbison v. Welsh, 242 Ind. 385, 418, 179 N.E.2d 727, 743-44 (1962) (Port Commission); Book v. State Office Bldg. Comm'n, 238 Ind. 120, 150, 149 N.E.2d 273, 289 (1958) (State Office Bldg. Commission); Ennis v. State Highway Comm'n, 231 Ind. 311, 324, 108 N.E.2d 687, 693-95 (1952) (Toll Road Commission).

Most of these entities have now been consolidated into the IFA.  It is now well settled, and the plaintiffs agree, that debt secured by revenue from the projects the bonds finance (tolls,

lease rentals, port fees, etc.) does not violate the Indiana constitutional ban on debt of "the State." The general credit of the State is not on the line to discharge these revenue bonds, and a creditor could not levy on the State House or a state park to recover its principal or interest. Ennis, 108 N.E.2d at 697. For that reason, the courts of this state and most others have consistently held that the debt of these authorities is not debt of the State. It follows, therefore, that Section 2 imposes no requirement that the proceeds of the lease, or any sale of any public work, be applied to discharge these obligations. Again, this is not merely a textual point. In practical terms, there is no reason why the debt of IFA should be required to be retired because, unlike the State of Indiana, IFA could immediately reissue debt if it chose to do so. Lawyers and investment bankers would profit from such a rule, but it is hard to see who else would.

In summary, logic, the constitutional debates and judicial precedent all lead to the conclusion that Article X, Section 2 of the Indiana Constitution requires neither debt of units of local government nor debt of IFA or similar entities to be retired with the proceeds of a sale or lease of public works because neither is "public debt" as that term is used in Section 2.

C. *Ad Valorem Taxation*

The Toll Road and the land upon which it lies is not now, and has not been since its acquisition by predecessors of IFA, required to pay taxes on that land. However, Indiana Code section 6-1.1-10-37 provides that if tax-exempt property is leased to another whose property is not exempt, then the leased property must be assessed and taxed as if owned by the lessee. By its terms Indiana Code section 6-1.1-10-37 arguably requires the General Assembly to tax the Concessionaire. This is a statutory provision, not one found in the Constitution. The legislature is free to enact exemptions to its own rules, and that is what Section 39 of HEA 1008 does. When the General Assembly authorized leasing the Toll Road to the Concessionaire, it specifically chose to exempt the private lessee from Indiana taxation. Section 39 of HEA 1008, codified at Indiana Code section 8-15.5-7-1, provides in pertinent part:

> A toll road project and tangible personal property used exclusively in connection
> with a toll road project that are:
>     (1) owned by the authority and leased, franchised, licensed, or otherwise conveyed to an operator; or

> (2) acquired, constructed, or otherwise provided by an operator in connection with the toll road project;
>
> under the terms of a public-private agreement are considered to be public property devoted to an essential public and governmental function and purpose and the property, and an operator's leasehold estate, franchise, license, and other interests in the property, are exempt from all ad valorem property taxes and special assessments levied against property by the state or any political subdivision of the state.

Section 39 removes any ambiguity that Indiana Code section 6-1.1-10-37 may have created and provides that the Concessionaire is "exempt from all ad valorem property taxes and special assessments" levied against the Toll Road.

The plaintiffs argue that Article X, Section 1 forbids the General Assembly from providing the Concessionaire this tax exemption. Article X, Section 1 of the Indiana Constitution provides:

> The General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal. The General Assembly may exempt from property taxation any property in any of the following classes: Property being used for municipal, educational, literary, scientific, religious or charitable purposes . . . .

In <u>Chadwick v. City of Crawfordsville</u>, 216 Ind. 399, 410, 24 N.E.2d 937, 942 (1940), we distinguished between a private and public purpose for a utility and held that a utility in the hands of a municipality is tax exempt. The trial court, relying on <u>Chadwick</u> and a case from the Seventh Circuit along with two other cases from this Court, held that the constitutional limit on exemptions turns on the character of the property, not its ownership. As a result, the Toll Road would retain its "municipal purpose" after the lease and the fact that a private lessee will operate the road is irrelevant. See <u>City of Louisville v. Babb</u>, 75 F.2d 162, 166 (7th Cir. 1935) (upholding a law that provided a tax exemption for a toll bridge operated by a municipal corporation of another state because it remained "municipal property"); <u>Steup</u>, 402 N.E.2d at 1227 (finding law providing tax exemption for Indiana Housing Finance Authority constitutional because the Authority was not a private corporation, but a state instrumentality operating for a legitimate public purpose); <u>Orbison</u>, 179 N.E.2d at 739 (upholding the tax exemption in the Indiana Port Commission Act because the Commission was not a private corporation). The trial court also noted that

the General Assembly "expressly found that the Toll Road serves a public purpose" and gave "great deference" to this legislative finding. The plaintiffs argue that the trial court's reasoning as applied to private operators of the Toll Road would allow owners of airlines, railroads, bus companies, and telecommunications companies to fall within the "public purposes" exception as well.

The plaintiffs appear to be correct that cases upholding a tax exemption against a constitutional attack have cited the ownership by a public entity as well as the use of the property. We agree that public ownership is ordinarily sufficient for exemption, but do not agree that it is necessary. Municipal ownership and municipal "use" are coupled in most examples that have heretofore been presented to the courts. But as the trial court noted, the "use" of the property is by the language of Section 1 the controlling factor. The lease will continue the property in the same use—a public highway—and as such is a permissible exemption. We also think the defendants are correct in contending that the Constitution contemplates exemption for a public owner. If a lease by the State requires that the property be taxed, the effect would be to lower the rent the lessee would be willing to pay, or to subject the State to local property taxes. Neither would further the object of Article X to protect and enhance public resources. We need not address this issue because we conclude that the use continues to be a municipal one as it has been for over fifty years.

## Conclusion

The order of the trial court is affirmed.

Shepard, C.J., and Sullivan and Rucker, JJ., concur.

Dickson, J., not participating.

19