**OAKEN BUCKET PARTNERS, LLC, Petitioner,**

v.

**HAMILTON COUNTY PROPERTY TAX ASSESSMENT BOARD OF APPEALS and Hamilton County Assessor, Respondents.**

No. 49T10–0612–TA–113.

Tax Court of Indiana.

July 24, 2009.

**1130**

---

Jeffrey T. Bennett, Bradley D. Hasler, Bingham McHale LLP, Indianapolis, IN, Attorneys for Petitioner.

Gregory F. Zoeller, Attorney General of Indiana, Jessica E. Reagan, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondents.

FISHER, J.

Oaken Bucket Partners, LLC (Oaken Bucket) challenges the final determination of the Indiana Board of Tax Review (Indiana Board) which denied its property tax exemption application for the 2004 tax year (year at issue). The issue for review, as restated by the Court, is whether the Indiana Board erred when it determined that Oaken Bucket's real property was neither owned nor predominately used for religious/charitable purposes during the year at issue.

## FACTS AND PROCEDURAL HISTORY

Oaken Bucket, a domestic limited liability company, owns the subject property: a two-story, multi-tenant office building, situated on the northeast corner of I–69 and Hague Road in Fishers, Indiana. During the year at issue, Oaken Bucket leased 28,000 square feet of its building to Heartland Church, Inc. (Heartland).[1] The other portion of its building was initially leased to A.G. Edwards & Sons, Inc. (A.G.Edwards), and then to First Horizon Home Loan Corporation (First Horizon). All three of these lessees, under the terms of their triple net leases, paid an annual base rent and certain other expenses including property taxes to their landlords.[2,3]

On May 17, 2004, Oaken Bucket timely filed an exemption application (Form 136)

with the Hamilton County Property Tax Assessment Board of Appeals (PTABOA), seeking a charitable/religious purposes exemption on the portion of its building leased to Heartland (hereinafter, the Heartland space). The PTABOA subsequently denied the application because it believed Oaken Bucket leased the property to Heartland "for a profitable gain per month[.]" (Cert. Admin. R. at 14.)

On July 21, 2004, Oaken Bucket filed a Petition for Review of Exemption (Form 132) with the Indiana Board. The Indiana Board conducted a hearing on the matter on July 13, 2006. At the hearing, Oaken Bucket claimed the Heartland space qualified for a charitable/religious purposes exemption, as it was owned, occupied, and predominately used for charitable/religious purposes. More specifically, Oaken Bucket claimed that the mere fact that it leased the majority of its building to Heartland demonstrated that it owned the Heartland space for charitable/religious purposes. (*See* Cert. Admin. R. at 412–13.) Oaken Bucket explained that through its leases with Heartland, it signified its express consent that the space be dedicated to, and used to further, Heartland's religious purposes. (*See* Cert. Admin. R. at 412–13.) To that end, Heartland's treasurer, Mr. David Wilkinson, explained that Heartland: provided two weekly Sunday worship services; operated a non-profit

---

1.  Heartland is a non-denominational church of approximately 500 members that voluntarily associates with "[t]he Baptist General Conference and its regional expression, [t]he Midwest Baptist Conference." (Cert. Admin. R. at 187.) Heartland has been designated as a 501(c)(3) organization by the Internal Revenue Service; its income is therefore exempt from federal taxation. (*See* Cert. Admin. R. at 184, 210–16.)

2.  A triple net lease generally requires the landlord to pay for structural repairs, while the tenant pays for utilities, property taxes, insurance, and property maintenance. *See,*

*e.g.,* Appraisal Institute, The Appraisal Of Real Estate 477 (12th ed.2001). In contrast, under the provisions of a gross lease (an example of a non-triple net lease), the landlord pays all of the expenses and the tenant only pays rent. *Id.*

3.  Boomerang Investments, Inc. (Boomerang) executed the leases with both A.G. Edwards and First Horizon; nevertheless, the parties found this fact to be irrelevant because Boomerang and Oaken Bucket were primarily owned and managed by the same individual. (*See* Cert. Admin. R. at 446–49, 479–80.)

daycare ministry for approximately 100 children from Monday through Friday; facilitated weekly youth ministries, adult Bible studies, and fellowship dinners throughout the year; and offered various classes to better acquaint individuals with the church and its beliefs. (Cert. Admin. R. at 432–33.)

In addition, Oaken Bucket claimed that its charitable ownership and use of the property was exemplified by its decision to charge Heartland below market rent. (*See* Cert. Admin. R. at 411.) To support that claim, Oaken Bucket presented the A.G. Edwards lease and the First Horizon lease. The A.G. Edwards lease required A.G. Edwards to remit an annual base rent of $15.50 per square foot for approximately 9,500 square feet of space. (Cert. Admin. R. at 217.) First Horizon's lease required it to pay an annual base rent of $15.00 per square foot for 10,421 square feet of space. (Cert. Admin. R. at 226.) Furthermore, Mr. Wilkinson explained that he had recently "shopped" the area for rental properties and found that market rent in comparable buildings ranged from $15.00 to $17.00 per square foot. (Cert. Admin. R. at 451.) In contrast, Heartland leased 15,000 square feet of space for $8.00 per square foot and another 13,000 square feet for $6.00 per square foot per annum. (*See* Cert. Admin. R. at 158, 176, 445–46, 451–52.)

Finally, Mr. Warren Byrd, a member of the church, explained that the space was both owned and used for charitable/religious purposes because Heartland was "just a start up church with very few members" when it executed the leases with Oaken Bucket. (Cert. Admin. R. at 408.) Mr. Byrd explained that although Heartland's services had transitioned from its pastor's home to a room at the Holiday Inn, the church lacked the financial wherewithal to purchase or provide a down payment for a property of that size. (Cert. Admin. R. at 409, 452, 466.) According to Mr. Byrd, the below market rent ultimately allowed the church to conduct its services in a space and location that facilitated an expansion of its ministry. (*See* Cert. Admin. R. at 408–09, 466.)

The PTABOA, however, asserted that Oaken Bucket's ownership and use of the space had little to do with religion or benevolence.[4] According to the PTABOA, Oaken Bucket's ownership and use of its property was analogous to that of any other landlord: it only owned and used the property for investment/profit-generating purposes. (*See* Cert. Admin. R. at 420, 468.) The PTABOA pointed to four aspects of Heartland's leases which it claimed evidenced a lack of charity on the part of Oaken Bucket.

The PTABOA first noted that Oaken Bucket had not dedicated the Heartland space exclusively to charitable/religious purposes because one of the lease provisions permitted the space to be used for commercial purposes. (*See* Cert. Admin. R. at 165 ¶4, 397, 471.) The PTABOA also claimed that Heartland's rent was actually "at or [just] slightly below [ ] market [rent.]" (Cert. Admin. R. at 397.) In support of that claim, the Hamilton County Assessor (Assessor) explained that she had retained the services of Mr. Timothy VanKirk, an MAI appraiser, to ascertain, *inter alia*, the market rent for triple net leases in the general area.[5] (Cert. Admin. R. at 310, 475 (footnote added).) The Assessor then introduced a letter prepared by Mr. VanKirk in which he opined that market

---

4. The PTABOA did not dispute that the Heartland space was occupied for religious purposes. (*See* Cert. Admin. R. at 467–68.)

5. The Assessor retained the services of Mr. VanKirk because the township's rental data was incomplete. (*See* Cert. Admin. R. at 475.)

rent for a triple net lease was "$8.00 to $10.00 per square foot of building area." (Cert. Admin. R. at 310.)

Next, the Assessor suggested that Heartland's rent was probably lower than A.G. Edwards' rent because Heartland assumed all of its own build-out costs, while A.G. Edwards' landlord assumed its build-out costs.[6] (*See* Cert. Admin. R. at 478–81 (footnote added).) Finally, the PTABOA asserted that besides charging rent, several of the lease provisions between Oaken Bucket and Heartland were "landlord friendly:" penalties for late rent payments, requiring security deposits, and requiring the tenant to pay for property taxes, utilities, and insurance. (Cert. Admin. R. at 394–95.) The PTABOA therefore asserted that Oaken Bucket owned and used the Heartland space to satisfy its profit needs, rather than its sense of gratuity/charity.

On November 16, 2006, the Indiana Board issued its final determination in which it concluded that Oaken Bucket had "failed to prove that it owns and uses [the Heartland space] in a predominately exempt (religious or charitable) manner." (Cert. Admin. R. at 121 ¶ 36.) In so concluding, the Indiana Board found that Oaken Bucket failed to demonstrate that its property was "owned or used ... for anything other than an investment[,]" given that Oaken Bucket had, for the most part, charged market rent for the Heartland space. (*See* Cert. Admin. R. at 119–20 ¶¶ 28–30.) As such, the Indiana Board affirmed the PTABOA's denial of Oaken Bucket's exemption application.

On December 29, 2006, Oaken Bucket initiated this original tax appeal. The Court heard the parties' oral arguments on June 23, 2008. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ When this Court reviews a final determination of the Indiana Board, it is limited to determining whether it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE ANN. § 33–26–6–6(e)(1)–(5) (West 2009). The party seeking to overturn the Indiana Board's final determination bears the burden of establishing its invalidity. *Osolo Twp. Assessor v. Elkhart Maple Lane Assocs.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003).

### Discussion

In Indiana, all tangible property is subject to taxation. *See* IND.CODE ANN. § 6–1.1–2–1 (West 2009). Nevertheless, the Indiana Constitution provides that the legislature may exempt certain categories of property from taxation. *See* IND. CONST. art. X, § 1. Pursuant to this grant of authority, the legislature enacted Indiana Code § 6–1.1–10–16 which, during the year at issue, provided that "[a]ll or part of a building is exempt from property taxation if it is owned, occupied, and [predominately] used ... for ... religious[ ] or charitable purposes." IND.CODE ANN. § 6–1.1–10–16(a) (West 2004). *See also* IND.CODE ANN.

---

**6.** Mr. Byrd subsequently explained, and pointed to, provisions in both of Heartland's leases which indicated that Oaken Bucket had assumed some of Heartland's build-out costs. (*See* Cert. Admin. R. at 169, 182, 492–94.)

§ 6–1.1–10–36.3(a) (West 2004) (defining "predominate use" as more than 50% of a property's use). This exemption also generally extended to the land on which the exempt building was situated. A.I.C. § 6–1.1–10–16(c).

■ While the taxpayer bears the burden of establishing that it is entitled to the exemption it seeks, it need not show a unity of ownership, occupancy, and use in order to fulfill that burden. *See Sangralea Boys Fund, Inc. v. State Bd. of Tax Com'rs*, 686 N.E.2d 954, 955 (Ind. Tax Ct.1997), *review denied*. Rather, the taxpayer must present probative evidence during the Indiana Board hearing which demonstrates that its property is owned for exempt purposes, occupied for exempt purposes, and predominately used for exempt purposes. *See Id.* at 959. "Once these three elements have been met, *regardless of by whom*, the property can be exempt from taxation." Id. (emphasis added).

The issue before the Court is whether the Indiana Board erred in concluding that the Heartland space was neither owned nor predominately used for charitable/religious purposes.[7] The parties' briefs and oral arguments indicate that resolution of this issue is dependent upon the answers to three other interrelated questions: (1) whether the Indiana Board's conclusion that Oaken Bucket owned and used the Heartland space for investment purposes only is supported by substantial evidence; (2) whether the Indiana Board's conclusion that Oaken Bucket charged Heartland market rent is supported by substantial

evidence; and, if not, (3) whether Oaken Bucket prima facie demonstrated that it fulfilled the ownership and use requirements of Indiana Code § 6–1.1–10–16.

**(1) Whether the Indiana Board's conclusion that Oaken Bucket owned and used the Heartland space for investment purposes only is supported by substantial evidence**

■ Oaken Bucket asserts that in denying the exemption, the Indiana Board improperly focused on, and ascribed to, a subjective intent (i.e., a profit motive). (*See* Pet'r Br. at 7–10.) Oaken Bucket argues that such a focus is not only irrelevant and unsupported by the evidence, but is also contrary to law because Indiana's constitution and statutes place the most emphasis on an objective factor: the manner in which property is actually used. (*See* Pet'r Br. at 12–13.)

In contrast, the PTABOA claims that Indiana's case law provides that the earning of profits is relevant within the context of property tax exemptions.[8] (*See* Resp'ts Br. at 7–10) (footnote added).) Consequently, the PTABOA argues that the Indiana Board's focus and findings were proper, as the evidence clearly demonstrated that Oaken Bucket owned and used its commercial property to further its profit-making purposes. (*See* Resp'ts Br. at 4, 13–14.) The Court, however, disagrees with the PTABOA.

■ The evaluation of whether property is owned, occupied, and predominately used for an exempt purpose is a fact sensitive inquiry; there are no bright-line tests.

---

7. In its final determination, the Indiana Board found that the PTABOA conceded that the Heartland space was occupied for religious purposes; therefore the Indiana Board did not address the issue. (Cert. Admin. R. at 116 ¶ 21.) Because neither party disputes this finding, the Court need not address it any further.

8. Although both the Assessor and the PTABOA have been named as respondents in this appeal, the Court will refer only to the PTABOA when discussing the respondents' arguments.

*See, e.g.,* Maurice T. Brunner, Annotation, *Property Tax: Exemption of Property Leased by and Used for Purposes of Otherwise Tax–Exempt Body,* 55 A.L.R.3d 430 (1974). Thus, while the existence of a profit motive may be germane to this inquiry, the exemption will not turn merely upon the existence of such a profit motive or the execution of a lease. *Cf., e.g., State Bd. of Tax Com'rs v. Indianapolis Lodge No. 17, Loyal Order of Moose, Inc.,* 245 Ind. 614, 200 N.E.2d 221, 225 (1964) (exempting a dining room that was used for both profit and exempt purposes) *with Orr v. Baker,* 4 Ind. 86 (Ind.1853) (holding church owned property, both rented and used for secular purposes, taxable). *See also College Corner, L.P. v. Dep't. of Local Gov't Fin.,* 840 N.E.2d 905, 908 (Ind. Tax Ct.2006) ("exemption may be granted even if income deemed incidental to [entity's] exempt purpose was received") (citation omitted). Indeed, if the mere existence of profits or the execution of a lease automatically rendered property taxable, the qualification for an exemption would, in large part, be dependent on an entity's status or its character. Such a result would be improper given that, in Indiana, an exemption turns on the *character of the property, not the character of its owner. Bonney v. Indiana Fin. Authority,* 849 N.E.2d 473, 487–88 (Ind.2006); *State ex. rel. Tieman v. City of Indianapolis,* 69 Ind. 375, 377 (Ind. 1879).

There is no dispute that Oaken Bucket collects rent from Heartland. That single fact, however, does not establish the extent of, or even if, Oaken Bucket derived a profit from leasing the Heartland space to the church. In this case, the record only evidences that the PTABOA *alleged* that Oaken Bucket's execution of the Heartland space leases was driven by its desire to generate profits. (*See* Cert. Admin. R. at 3–505.) The PTABOA's allegations, however, are not supported by factual evidence and, therefore, are not probative evidence.[9] *Knox County Prop. Tax Assessment Bd. of Appeals v. Grandview Care, Inc.,* 826 N.E.2d 177, 184–85 (Ind. Tax Ct.2005) (stating that allegations unsupported by factual evidence constitute nothing more than mere allegations) (citations omitted and footnote added). Accordingly, the Indiana Board's conclusion as to this issue is not supported by substantial evidence.[10]

**(2) Whether the Indiana Board's conclusion that Oaken Bucket charged Heartland market rent is supported by substantial evidence**

■ During the Indiana Board hearing, Oaken Bucket presented evidence that it rented the Heartland space to the church for below the typical market rent of $15.00 per square foot. In response, the PTABOA presented Mr. VanKirk's letter which, in its entirety, provided:

> At your request I have performed the following research regarding [Oaken Bucket's] property:
> —Inspected the exterior of the premises
> —Reviewed the property record card
> —Reviewed rental com parables relevant to the property's location and physical attributes

---

9. To the extent the PTABOA believed that any profits earned by Oaken Bucket from the lease of the Heartland space were vital to an accurate determination by the Indiana Board, the PTABOA—not Oaken Bucket—was responsible for getting the information regarding the profits into the record. The PTABOA could have accomplished this through a variety of discovery tools.

10. " 'Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Amax Inc. v. State Bd. of Tax Com'rs,* 552 N.E.2d 850, 852 (Ind. Tax Ct.1990) (citation omitted).

After review of the above, I have concluded a range in market rental expressed on a "triple net" basis of $8.00 to $10.00 per square foot of building area. This lease basis would typically call for tenant reimbursement of property taxes, insurance and non-structural maintenance. The typical lease term for this type of property would extend from 3 to 5 years.

Please advise if any additional services are required.

(Cert. Admin. R. at 310.)

In analyzing this evidence and reaching its conclusion, the Indiana Board stated in its final determination:

[Oaken Bucket] charged Heartland $8.00 per square foot for 15,000 square feet and $6.00 per square foot for an additional 13,000 square feet. [Oaken Bucket] leased another 9,500 square feet of space in the same building to A.G. Edwards for $15.50 per square foot. Mr. Wilkinson testified that based on his experience and knowledge of the market in the area, [ ] $15.00 per square foot was the going rate. The [PTABOA] presented a letter signed by an MAI appraiser stating his opinion that a market range for a triple net rate would be between $8.00 and $10.00 per square foot. Thus, while there is a little evidence that Heartland pays less than market price for its leases, there is also a little evidence that Heartland pays something close to market price. . . . The totality of this evidence does not convince the Board that Heartland pays significantly less than market rate for its two areas.

(Cert. Admin. R. at 119 ¶ 28 (footnotes omitted).) Because the Indiana Board provided no further reasoning as to this issue, the Court presumes the Indiana Board concluded that the PTABOA's letter rebutted Oaken Bucket's prima facie market rent evidence.[11] In other words, the Indiana Board concluded that market rent was $8.00 to $10.00 per square foot rather than $15.00 per square foot. That conclusion, however, is not supported by the evidence in the record.

The estimation of market rent is dependent upon several factors which can include (but are not limited to) the actual terms of the leases, the determination of what constitutes the sample area, the physical characteristics of the subject property, and the comparability of other rental properties. *See, e.g.,* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 498–501 (12th ed.2001); INTERNATIONAL ASS'N OF ASSESSING OFFICERS, PROPERTY ASSESSMENT VALUATION 205–10 (2nd ed.1996). *See also, e.g., Beyer v. State,* 258 Ind. 227, 280 N.E.2d 604, 607 (1972) (explaining that the comparability of real property is dependent upon several factors). Consequently, the PTABOA's letter, without any accompanying explanation or evidence, is conclusory and lacks probative value. *See Inland Steel Co. v. State Bd. of Tax Com'rs,* 739 N.E.2d 201, 220 (Ind. Tax Ct.2000) (explaining that an expert appraiser's evidence is conclusory when he fails to explain the basis of his opinion), *review denied.* As such, the PTABOA's letter did not rebut Oaken Bucket's prima facie evidence of market rent. Accordingly, the Indiana Board's conclusion that market rent was between $8.00 to $10.00 is not supported by substantial evidence.

---

11. If this was not the inference the Indiana Board intended, however, it should have been more explicit in its final determination. Indeed, if there are any inferences to be made from the evidence upon which the Indiana Board relies, it is up to the Indiana Board to explain its reasoning *in its final determination* and cite to the evidence and any other authority (i.e., legal or otherwise) that supports its reasoning.

Oaken Bucket therefore prima facie demonstrated that it leased the Heartland space to the church for below market rent.

**(3) Whether Oaken Bucket prima facie demonstrated that it fulfilled the ownership and use requirements of Indiana Code § 6–1.1–10–16**

■ First and foremost, when a unity of ownership, occupancy, and use is lacking (as is the case here), both entities must demonstrate that they possess their own exempt purposes, but they need not demonstrate that they both directly used the property in furtherance of those purposes. Indeed:

> If one seeks to reward charities for their activities and to encourage beneficial public service, drafting a statute that severely limits the ability of a charity to organize and operate in an efficient and cost-effective manner would be illogical. *To be sure, the words "own, occupy, and use" restrict the activities that may be conducted on the property before an entity will qualify for an exemption. However, the intent of the legislature is not to force a single charitable entity to achieve a unity of ownership, occupation, and use, but to ensure that the particular arrangement is not driven by a profit motive.* Denying a property owner a tax exemption for allowing organized charities the use of the property discourages the commitment of such property for charitable uses.

*Sangralea*, 686 N.E.2d at 958 (emphasis added). Thus, the fact that Oaken Bucket did not provide the religious activities has no bearing upon the grant of exemption in this case, as it is beyond dispute that Heartland consistently conducted a variety of religious activities within the space. Heartland's actual use of the space during the year at issue also neutralized the lease provision which provided that the space could be used for commercial purposes.

Furthermore, and as previously explained, the evidence in the record does not indicate that Oaken Bucket's desire to profit was any more predominate than its desire to provide Heartland with an appropriate space through which it could further its tenets. *Supra* pp. 1134–37. To that end, the Court will not judicially impart a predominate profit motive to Oaken Bucket merely because of its landlord status. *See College Corner*, 840 N.E.2d at 911 (refusing to judicially impart any particular profit motive to a for-profit entity whose charitable endeavors generated the profits); *accord State Bd. of Tax Comm'rs v. Int'l Bus. College, Inc.*, 145 Ind.App. 353, 251 N.E.2d 39, 42 (1969) (" 'exemption is not lost where income is not derived as a result of a *dominant profit motive*' ") (citation omitted and emphasis added). Oaken Bucket therefore prima facie established that the Heartland space was predominately used for charitable/religious purposes.

Lastly, Oaken Bucket's charging of below market rent signified that it owned the Heartland space for a charitable purpose, as this fact attested to Oaken Bucket's decision to assist Heartland with the furtherance of its religious purposes. In so doing, Oaken Bucket simultaneously conferred a benefit to both the public and private sectors. More specifically, the uncontested evidence in this case indicates that the charging of below market rent benefited both Heartland and the public in that it facilitated the expansion of Heartland's ministry. *See supra* pp. 1132–33. *See also, e.g., State Bd. of Tax Comm'rs v. Wright*, 139 Ind.App. 370, 215 N.E.2d 57, 60 (1966) (explaining that religious purposes exemptions surpass mere tradition, as their historical roots are grounded in antiquity). Consequently, Oaken Bucket's charitable purpose was manifested through its charging of below market rent, as it prima facie demonstrated that Oaken

Bucket owned and used the Heartland space in a manner that differed from that of everyday landlords. Accordingly, the Court concludes that the Indiana Board erred when it determined that the Heartland space was neither owned nor predominately used for charitable/religious purposes during the year at issue.

## CONCLUSION

For the above stated reasons, the Indiana Board's final determination is REVERSED. The matter is REMANDED to the Indiana Board so that it may instruct the appropriate assessing officials to take actions consistent with this opinion.