ATTORNEYS FOR PETITIONERS:
**WILLIAM A. RAMSEY**
**JOSHUA C. NEAL**
BARRETT & McNAGNY LLP
Fort Wayne, IN

**PAUL D. CULLEN, JR.**
**KATHLEEN B. HAVENER**
THE CULLEN LAW FIRM, PLLC
Washington, DC

ATTORNEYS FOR RESPONDENT:
**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**LYDIA A. GOLTEN**
**STEPHEN J. REEN**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

**SEAN P. BURKE**
**HAMISH S. COHEN**
MATTINGLY, BURKE, COHEN &
BIEDERMAN LLP
Indianapolis, IN



FILED
Jan 10 2024, 2:40 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| B.L. REEVER TRANSPORT, INC.,<br>CHARLES PAAR, d/b/a SANDMAN<br>SERVICES, and LELAND WILKINS,<br>d/b/a LOST RIVER TRUCKING,<br><br>Petitioners,<br><br>v.<br><br>INDIANA DEPARTMENT OF<br>STATE REVENUE,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 20T-TA-00009<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**January 10, 2024**

WENTWORTH, Special J.

B.L. Reever Transport, Inc., Charles Paar (d/b/a Sandman Services), and Leland

Wilkins (d/b/a Lost River Trucking) have appealed the Indiana Department of State

Revenue's denials of their claims for refund of motor carrier fuel tax ("MCFT") remitted during the 2016 and 2017 tax years. The matter is currently before the Court on the parties' cross-motions for summary judgment. Upon review, the Court grants summary judgment in favor of the Department and against B.L. Reever, Paar, and Wilkins.

## FACTS AND PROCEUDRAL HISTORY

The following facts are not in dispute. B.L. Reever, Paar, and Wilkins are small business motor carriers (collectively, "Motor Carriers") that are registered with and authorized by the U.S. Department of Transportation to haul others' property in interstate commerce. (See Joint Stipulations of Facts ("Jt. Stip.") ¶¶ 4, 10, 17, 29.) During the years at issue, they logged a varying number of miles and, therefore, consumed different amounts of fuel while hauling property on Indiana's roadways, including the Indiana Toll Road. (See Jt. Stip. ¶¶ 5, 11, 18.) As a result, they each remitted quarterly payments to the Department for MCFT. (See Jt. Stip. ¶¶ 5-6, 11-12, 18-19.)

On November 8, 2017, Paar and Wilkins each filed separate claims seeking refunds of the portion of MCFT paid with respect to their consumption of fuel on the Toll Road for one or more of the quarters in 2016. (See Jt. Stip. ¶¶ 12-14, 19-21, Exs. 3, 5.) Just over a year later, B.L. Reever filed a claim for refund of MCFT paid for its consumption of fuel on the Toll Road during the fourth quarter of 2017. (See Jt. Stip. ¶¶ 6-7, Ex. 1.) Ultimately, Paar sought a refund of $56.27 for the 2016 tax year, Wilkins sought a refund of $7.47 for the 2016 tax year, and B.L. Reever sought a refund of $8.02 for the 2017 tax year. (Jt. Stip. ¶¶ 6, 14, 21.)

On December 17, 2018, the Department sent Paar and Wilkins separate letters

2

stating that it was "unable to process" their refund claims because "[t]oll [r]oads are not exempt in Indiana." (Jt. Stip. ¶¶ 15-16, 22-23, Exs. 4, 6.) The following day, the Department sent B.L. Reever a similar letter explaining that its refund claim could not be processed because there were "[n]o refunds for toll roads." (Jt. Stip. ¶¶ 8-9, Ex. 2.) On February 15, 2019, B.L. Reever, Paar, and Wilkins each filed a protest. (Jt. Stip. ¶ 24, Exs. 7a-7c.) While their individual protests were pending, they also filed a single, combined appeal with this Court on March 15, 2019. (Jt. Stip. ¶ 25.) The Court, consistent with the parties' subsequent agreement, dismissed that appeal without prejudice on June 21, 2019. (Jt. Stip. ¶¶ 25-26.) Several months later, the Department conducted an administrative hearing on the three pending protests and, on February 5, 2020, issued final orders denying each protest. (See Jt. Stip. ¶ 27, Exs. 8-10.)

On May 4, 2020, the Motor Carriers initiated this original tax appeal as a small tax case. On July 6, 2020, the Department moved to dismiss the appeal pursuant to Indiana Trial Rule 12(B), and shortly thereafter, the parties filed their first cross-motions for summary judgment. See, e.g., B.L. Reever Transp., Inc. v. Indiana Dep't of State Revenue, 163 N.E.3d 968, 971 n.1 (Ind. Tax Ct. 2021). The Court subsequently denied each of those motions. See id.

On September 17, 2021, the parties filed their second cross-motions for summary judgment, disputing whether the Toll Road was a "highway" for purposes of the MCFT. (See Pet'rs' Mem. Supp. Mot. Summ. J. ("Pet'rs' Br.") at 4-10; Resp't Br. Supp. Mot. Summ. J. ("Resp't Br.") at 24-40.) On December 1, 2021, the Court held a hearing on the parties' cross-motions. Additional facts will be supplied when necessary.

3

## STANDARD OF REVIEW

The Tax Court reviews final determinations of the Department <u>de novo</u>. IND. CODE § 6-8.1-9-1(c) (2024). Accordingly, the Court is not bound by the evidence presented or the issues raised during the administrative proceedings. <u>Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue</u>, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), <u>review denied</u>. The Court will grant a motion for summary judgment only when the designated evidence demonstrates that no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). Cross-motions for summary judgment do not alter the standards for determining whether summary judgment is warranted. <u>Horseshoe Hammond</u>, 865 N.E.2d at 727.

## LAW

During the years at issue, Indiana imposed a MCFT "on the consumption of motor fuel by a carrier in its operations on <u>highways</u> in Indiana." IND. CODE § 6-6-4.1-4(a) (2016) (amended 2017) (emphasis added). The word "highway" was defined for purposes of the MCFT as "the entire width between the boundary lines of every <u>publicly maintained way</u> that is open in any part to the use of the public for purposes of vehicular travel." IND. CODE § 6-6-4.1-1(h) (2016) (emphasis added). Furthermore, the statute designated the formula for calculating the amount of fuel consumed for purposes of imposing the MCFT as follows:

> The amount of motor fuel consumed by a carrier in its operations on highways in Indiana is the total amount of motor fuel consumed in its entire operations within and without Indiana, multiplied by a fraction. The numerator of the fraction is the total number of miles traveled on highways in Indiana, and the denominator of the fraction is the total number of miles traveled within and without Indiana.

I.C. § 6-6-4.1-4(b). A motor carrier's tax liability was then calculated by multiplying the tax rate in effect for the reporting period by the total amount of fuel consumed by the carrier in its operations on Indiana highways. See I.C. § 6-6-4.1-4-(c).

**ANALYSIS**

On appeal, the Motor Carriers claim that they are entitled to a refund of the MCFT they paid on the fuel consumed traveling on the Toll Road during the 2016 and 2017 tax years for alternate reasons. (See, e.g., Pet'rs' Br. at 1-2; Pet'rs' Reply Resp't Opp'n Pet'rs' Mot. Summ. J. ("Pet'rs' Reply Br.") at 1-8.) First, they claim the imposition of the MCFT during the years at issue was improper because the Toll Road did not meet the statutory definition of a "highway." (See, e.g., Hr'g Tr. at 4-6.) In the alternative, they assert that the Department erred in denying their refund claims due to certain admissions made in a related federal case. (See, e.g., Pet'rs' Reply Br. at 4-5.) Moreover, the Motor Carriers claim that the holding in that federal case bars several of the Department's arguments in this case. (See Pet'rs' Reply Br. at 5-8; Pet'rs' Sursurreply Resp't Surreply Supp. Resp't Mot. Summ. J. ("Pet'rs' Sursurreply Br.") at 2-5.)

### I. Statutory Definition of "Highway"

In their motion for summary judgment, the Motor Carriers claim that their fuel consumption on the Toll Road is not subject to MCFT because the Toll Road is not a "highway," as that word is defined under the MCFT statute, because it is not a "publicly maintained way." (See, e.g., Pet'rs' Br. at 1-2.) Specifically, the Motor Carriers assert that the Toll Road was not publicly maintained because over fifteen years ago it was leased to a private entity that assumed responsibility for the Toll Road's upkeep. (See

5

Pet'rs' Br. at 4-8; Jt. Stip. ¶ 33.) As support, they point to both the enabling legislation for the lease and the lease itself, claiming that together they created a "public-private partnership" that formed a "'private entity partially or entirely responsible' for several aspects of the Toll Road['s operations], including its maintenance." (See, e.g., Pet'rs' Br. at 9-10 (citation omitted).) (See also Pet'rs' Br. at 4-7; Hr'g Tr. at 8-14). Consequently, the Motor Carriers claim that they are entitled to judgment in their favor because the undisputed material facts show the Toll Road was privately maintained during the years at issue, and as a matter of law, the MCFT cannot be imposed on fuel consumed when not traveling on a "publicly maintained way." (See Pet'rs' Br. at 4-10.)

Constructed in the 1950s, the Toll Road "runs through the seven Indiana counties along Michigan's southern border. The road is a major artery connecting Chicago and points west with destinations in the Northeast." Bonney v. Indiana Fin. Auth., 849 N.E.2d 473, 476 (Ind. 2006). The Toll Road has been owned by the Indiana Finance Authority ("IFA") since May 2005, and in April of 2006, the IFA leased the Toll Road to a private entity, the ITR Concession Company LLC ("Concessionaire"), for a period of 75 years. See id. (See also Jt. Stip. ¶¶ 40, 42, 44-45, Ex. 11.)

Subsequent to the lease transaction, the "Indiana Toll Road Concession and Lease Agreement" (the "Lease")[1] and the contemporaneously created "Concession and Lease Agreement for the Indiana Toll Road Operating Standards Manual" ("Operating Standards Manual") govern the operation and maintenance of the Toll Road during the

---

[1] The Lease has been amended several times since 2006, (see Joint Stipulations of Fact ¶ 47), and the parties disagree about whether the amendments are germane to their cross-motions. (Compare Pet'rs' Mem. Supp. Mot. Summ. J. at 5 n.6 (stating that none of the amendments to the Lease are "critical") with Resp't Br. Supp. Mot. Summ. J. at 6 (asserting that the 2017 amendment to the Lease is relevant).) The Court, however, does not need to settle the disagreement about the relevance of the Lease amendments to resolve the cross-motions.

6

entire lease period. (See Jt. Stip. ¶¶ 48-49, Exs. 11, 21-24.) For example, the Lease provides that "the IFA shall . . . grant the Concessionaire an exclusive franchise and license for and during the [Lease t]erm to provide Toll Road Services, and in connection therewith to operate, manage, <u>maintain</u>, rehabilitate and toll the Toll Road for Highway Purposes and otherwise in accordance with and pursuant to" the Lease. (Jt. Stip., Ex. 11 at REE-732 (emphasis added).) Furthermore, the preamble to the three-volume Operating Standards Manual states that its purpose:

> is to provide the general terms and conditions for Volume I: Maintenance Manual, Volume II: Operations and Procedures Manual and Volume III: Environmental Management Manual (collectively, the "Operating Standards") for the [Toll Road]. . . . The Operating Standards provide guidelines and criteria to the Concessionaire on the standards, specifications, policies, procedures and processes that apply to the operation, <u>maintenance</u>, rehabilitation and tolling of, and capital improvements to, the [Toll Road]."

(Jt. Stip. ¶ 48(c), Ex. 21 at REE-8202 (emphasis added).) Moreover, the 110-page Maintenance Manual contains guidelines and other criteria the Concessionaire must follow when performing various maintenance activities on the Toll Road, including, for example, the standards for roadway, pavement delineation, and landscape and roadside maintenance. (See Jt. Stip. ¶ 48(d), Ex. 22 at REE-7210, REE-7213.)

The language of the Lease states that the entire lease transaction was contingent on its enabling legislation, which was enacted into law as Public Law 47-2006 and currently is codified at Indiana Code §§ 8-15.5-1-1 through 8-15.5-13-8 (hereinafter, "Article 15.5"). See Bonney, 849 N.E.2d at 476; IND. CODE §§ 8-15.5-1-1 to -13-8 (2024). This enabling legislation provided that the powers it conferred were "in addition and supplemental to the powers conferred by any other law. [Thus, i]f any

7

other law or rule is inconsistent with [it], [Article 15.5] is controlling as to any public-private agreement entered into under th[e] article." IND. CODE § 8-15.5-1-1 (2016) (emphasis added). A "public-private agreement" was defined as "an [Article 15.5] agreement . . . between a private entity and the [IFA] under which the private entity, acting on behalf of the [IFA] (and, where applicable, a governmental entity) as lessee, licensee, or franchisee, will plan, design, acquire, construct, reconstruct, equip, improve, extend, expand, lease, operate, repair, manage, maintain, or finance a project." IND. CODE § 8-15.5-2-8 (2016) (emphases added) ("Public-Private Agreement Statute"); see also IND. CODE § 8-15.5-2-2 (2016) (providing that the word "Authority" refers to the IFA for purposes of Article 15.5).

The parties do not dispute that the Lease is a "public-private agreement" as that term is defined under Article 15.5. (See, e.g., Pet'rs' Br. at 9 and Pet'rs' Opp'n Resp't Mot. Summ. J. ("Pet'rs' Resp. Br.") at 11; Resp't Resp. Opp'n Pet'rs' Mot. Summ. J. ("Resp't Resp. Br.") at 4.) Accordingly, maintenance activities performed by the Concessionaire on the Toll Road in furtherance of its obligations under the Lease are done "acting on behalf of" the IFA. See I.C. § 8-15.5-2-8. Moreover, when the IFA exercises its powers as an independent public body politic and corporate entity, it is performing "an essential governmental, public, and corporate function." IND. CODE § 4-4-11-4(a) (2006) (repealed 2018); see also Bonney, 849 N.E.2d at 479-80 (explaining that the IFA is a "municipal corporation" because it was "created by state law and is both a 'public instrumentality' and a 'public corporate body'" (citation omitted)). Accordingly, whether the Toll Road is a "highway," i.e., a "publicly maintained way," for purposes of imposing the MCFT depends on the meaning of the phrase "acting on

8

behalf of" as used in the Public-Private Agreement Statute.

The interpretation of a statute is a pure question of law reserved for the courts. See Grandville Coop., Inc. v. O'Connor, 25 N.E.3d 833, 838 (Ind. Tax Ct. 2015). "The first step in interpreting a statute is to determine whether the Legislature has spoken clearly and unambiguously on the point in question." City of Carmel v. Steele, 865 N.E.2d 612, 618 (Ind. 2007) (citation omitted). Fittingly, therefore, clear and unambiguous statutes leave no room for judicial construction. Id.

In this case, the Public-Private Agreement Statute does not define the phrase "acting on behalf of." See I.C. § 8-15.5-2-8. "[W]hen a statutory term is undefined, the legislature directs [the courts] to interpret the term using its "'plain, or ordinary and usual, sense.'" Rainbow Realty Grp., Inc. v. Carter, 131 N.E.3d 168, 174 (Ind. 2019) (citation omitted); see also Johnson Cnty. Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue, 568 N.E.2d 578, 581 (Ind. Tax Ct. 1991) (explaining that non-technical statutory words and phrases are to be understood in their plain, ordinary, and usual sense), aff'd, 585 N.E.2d 1336 (Ind. 1992). To determine the plain, ordinary, and usual meaning of an undefined phrase, Indiana courts customarily refer to English language dictionaries. See, e.g., Moriarity v. Indiana Dep't of Nat. Res., 113 N.E.3d 614, 621 (Ind. 2019) (relying on Webster's Third New International Dictionary to define the word "stream"); Buckeye Hosp. Dupont, LLC v. O'Day, 144 N.E.3d 850, 856 (Ind. Tax Ct. 2020) (relying on Webster's Third New International Dictionary to define the word "hotel"); Estes v. State, 166 N.E.3d 950, 952 (Ind. Ct. App. 2021) (using the Merriam-Webster Dictionary to define the word "endanger"). To this end, the Court looks to Webster's Dictionary, which states the plain, ordinary, and usual meaning of the phrase

9

"on behalf of" is "in the interest of[,] as the representative of[, or] for the benefit of[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY 198 (2002 ed.). Similarly, the American Heritage Dictionary provides that the phrase "on behalf of" means "[a]s the agent of; on the part of" or "[f]or the benefit of; in the interest of." The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=on+behalf+of (last visited Jan. 8, 2024).

In light of these definitions, when the Concessionaire performs maintenance activities on the Toll Road pursuant to the Lease, it does so in the interest of, in the name of, or as the agent or representative of the IFA, a "public instrumentality" and "public corporate body" expressly created by the Legislature. See I.C. § 4-4-11-4(a); see also Bonney, 849 N.E.2d at 479-80. In effect, therefore, the IFA through its proxy, the Concessionaire, maintains the Toll Road as part of its statutory obligation to provide essential governmental and public functions. See I.C. § 4-4-11-4(a). As a result, the Court holds that the Toll Road was a publicly maintained way during the years at issue, meeting the MCFT's statutory definition of a "highway." Accordingly, the Motor Carriers are not entitled to judgment as a matter of law on this basis, having failed to demonstrate that the Toll Road was not a "highway" for purposes of the MCFT.

## II.  Admissions

The Motor Carriers assert in the alternative that they are entitled to judgment as a matter of law because the Department is bound by certain admissions made in a related federal case concerning the constitutionality of increases to certain Toll Road tolls (the "Owner-Operator litigation"). (See, e.g., Pet'rs' Reply Br. at 4-5 (referring to Owner-Operator Indep. Drivers Ass'ns v. Holcomb, No. 1:19-cv-00086-RLY-MJD, 2019

10

WL 8955083 (S.D. Ind. Aug. 12, 2019), R. & R. adopted sub nom. by Owner-Operator

Indep. Drivers Ass'n v. Holcomb, No. 1:19-cv-00086-RLY-MJD, 2020 WL 1149595 (S.D.

Ind. Mar. 10, 2020), aff'd, 990 F.3d 565 (7th Cir. 2021), cert. denied)).)  Specifically, the

Motor Carriers maintain that in those cases the State of Indiana, through the

Concessionaire, the IFA, and Governor Eric J. Holcomb, made the following

admissions:

- Pursuant to the [L]ease, [the Concessionaire] is responsible for all operation and maintenance of the Toll Road until 2081[;]

- Indiana has exercised its rights as a property owner of the Toll Road to lease that property – and the attendant right to collect tolls – to [the Concessionaire], a private toll-road company that is now operating the Toll Road as a private enterprise[;]

- Indiana, by contrast, does not even operate the Toll Road; it has rented the Toll Road to [the Concessionaire] in an arm's-length market transaction for valuable consideration[;]

- That Indiana caps [the Concessionaire's] tolls is inconsequential[; and]

- Indiana's budget commits 100% of the money the State receives from [the Concessionaire] under the [L]ease amendment to fund work on roads that the Indiana General Assembly has determined have a nexus with the Toll Road. . . . And those figures do not include the additional $50 million in improvements that the amended [L]ease obligates [the Concessionaire] to make to the Toll Road itself.

(Pet'rs' Reply Br. 4-5 (internal quotation marks, citations, and footnotes omitted).)

The Motor Carriers claim these admissions establish that the Toll Road was

privately maintained by the Concessionaire, and, therefore, preclude the Department

from denying their refunds in this case.  (See Pet'rs' Reply Br. at 4-5.)  In other words,

the Motor Carriers claim that on the basis of several judicial admissions made during

the Owner-Operator litigation, the Department is barred from arguing that the Toll Road

11

was publicly maintained during the years at issue in the present case.

A "judicial admission" is a formal stipulation or acknowledgment, voluntarily made in a pleading or during a trial, that admits a material fact or concedes an element of a claim or defense. See, e.g., Harr v. Hayes, 106 N.E.3d 515, 526-27 (Ind. Ct. App. 2018), op. corrected on reh'g, 108 N.E.3d 405 (Ind. Ct. App. 2018). A judicial admission is conclusive and binding upon the party making it and relieves the opposing party of the duty to present evidence on that issue. Stewart v. Alunday, 53 N.E.3d 562, 568-69 (Ind. Ct. App. 2016).

The Motor Carriers have not claimed that the alleged judicial admissions were made at trial. (See Pet'rs' Reply Br. at 4-5; Pet'rs' Sursurreply Br. at 1.) Instead, the Motor Carriers state that the admissions were made in the defendants' briefs regarding their joint motion to dismiss for failure to state a claim in the Owner-Operator litigation:

> [T]he quoted arguments were not part of [the p]laintiff's Complaint in the Owner-Operator[] litigation, but rather were excerpted from the [defendants'] briefs – from the [defendants'] "Background" and "Argument Section I(A)" in [their] Motion to Dismiss in the District Court, and [their] "Statement of the Case, Section II" in [their] brief to the Seventh Circuit.

(Pet'rs' Sursurreply Br. at 1 (emphasis omitted).) (See also Pet'rs' Reply Br. at 4-5 nn. 3-7 (citing Pet'rs' Supp'l Des'g Evid. Supp. Mot. Summ. J., Ex. 16 at 6, 10, 13 and Ex. 17 at 8-9).) Motions and responses to motions, however, are not pleadings as that term is defined by Indiana Rule of Trial Procedure 7(A). See Ind. Trial Rule 7(A) (specifying what constitutes a pleading); see also, e.g., Seastrom, Inc. v. Amick Constr. Co., 306 N.E.2d 125, 127 (Ind. Ct. App. 1974) (explaining why a motion is not a pleading). Consequently, the statements on which the Motor Carriers have relied cannot be considered as judicial admissions. As a matter of law, therefore, the Motor Carriers are

12

not entitled to judgment on the basis that binding judicial admissions were made in the Owner-Operator litigation.  See Stewart, 53 N.E.3d at 570 (providing that determining "[w]hether a party's statement constitutes a judicial admission is a question of law") (citation omitted).

### III. The Federal Case

Finally, the Motor Carriers assert that the Court should bar the Department from claiming that the Toll Road was publicly maintained during the years at issue based on the resolution of the Owner-Operator litigation.  (See, e.g., Pet'rs' Sursurreply Br. at 2-5.)  More specifically, the Motor Carriers explain that in that federal case the defendants successfully claimed that the State of Indiana acted "as a private market participant" when it leased the Toll Road to the Concessionaire, making all acts of leasing, operating, and maintaining the Toll Road "a private enterprise not a governmental activity[.]"  (See Pet'rs' Reply Br. at 5-6; Pet'rs' Sursurreply Br. at 2-5; Hr'g Tr. at 16-20.)

While the Motor Carriers' arguments suggest that the relief they seek is grounded in equity, they have not identified which equitable principle applies.  (See, e.g., Pet'rs' Reply Br. at 5-6; Hr'g Tr. at 16-20.)  At best, they indirectly imply that their claims are

based on the doctrine of judicial estoppel.[2]  (See Pet'rs' Sursurreply Br. at 4-5.)  In so

doing, however, they have not addressed or have simply glossed over several

differences between the Owner-Operator litigation and this case.

For instance, the Motor Carriers disregarded the differences in the procedural

postures of the Owner-Operator cases and this case.  (See Pet'rs' Reply Br. at 3-8;

Pet'rs' Sursurreply Br. at 1-5.)  Specifically, each of the Owner-Operator decisions

concerned the resolution of the defendants' joint motion to dismiss for failure to state a

claim.  See, e.g., Owner-Operator Indep. Drivers Ass'ns, No. 1:19-cv-00086-RLY-MJD,

2019 WL 8955083, at *1.  As a result, the "facts" as determined by the courts in each of

those decisions were "not necessarily objectively true" because in reviewing those

motions to dismiss, the courts were required to "accept[] as true all factual allegations in

the [c]omplaint and draw[] all reasonable inferences in favor of [p]laintiffs as the non-

moving party."  See, e.g., id.  On the other hand, this case involves the resolution of

cross-motions for summary judgment requiring the Court to determine, among other

things, whether the designated evidence demonstrates that no genuine issues of

---

[2]  The doctrine of judicial estoppel has been explained as follows:

> Judicial estoppel is a judicially created doctrine that seeks to prevent a
> litigant from asserting a position that is inconsistent with one asserted in
> the same or a previous proceeding.  Judicial estoppel is not intended to
> eliminate all inconsistencies; rather, it is designed to prevent litigants from
> playing fast and loose with the courts.  The primary purpose of judicial
> estoppel is not to protect litigants but to protect the integrity of the
> judiciary.  The basic principle of judicial estoppel is that, absent a good
> explanation, a party should not be permitted to gain an advantage by
> litigating on one theory and then pursue an incompatible theory in
> subsequent litigation.  Judicial estoppel only applies to intentional
> misrepresentation, so the dispositive issue supporting the application of
> judicial estoppel is the bad-faith intent of the litigant subject to estoppel.

Morgan Cnty. Hosp. v. Upham, 884 N.E.2d 275, 280 (Ind. Ct. App. 2008) (citations and internal
quotation marks omitted), trans. denied.

material fact exist.  See T.R. 56(C).  See also Hughley v. State, 15 N.E.3d 1000, 1003 (Ind. 2014) (providing that "'an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of truth, or if the undisputed material facts support conflicting reasonable inferences'") (emphases added and citation omitted).

Moreover, the Motor Carriers have summarily, yet incorrectly, concluded that any differences between the issues in the Owner-Operator cases and this case did not matter because the "market-participant doctrine" is "an all or nothing rule."  (See Hr'g Tr. at 18-20; see also Pet'rs' Reply Br. at 3-8; Pet'rs' Sursurreply Br. at 1-5.)  The market-participant doctrine "'differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause.'"  Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 592 (1997) (citations omitted).  Nonetheless, "[i]t is well settled that a state may act as a market participant with respect to one portion of a program while operating as a market regulator in implementing another.  Accordingly, '[c]ourts must evaluate separately each challenged activity of the state to determine whether it constitutes participation or regulation.'"  United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 438 F.3d 150, 158 (2d. Cir. 2006), aff'd, 550 U.S. 330 (2007) (citation omitted).

As explained in the Owner-Operator decisions, that litigation concerned the constitutionality of increases to certain Toll Road tolls:

> On September 4, 2018, Defendant Governor Holcomb announced his infrastructure plan that called for a $1 billion expenditure for infrastructure projects known as the "Next Level Connections Program."  [The Concessionaire] agreed to fund the program with $1 billion and, in return, was authorized by the IFA to increase toll rates for Class 3 and higher vehicles by 35 percent.  This

15

> authorization is reflected in the amended [L]ease agreement.  The increase in tolls went into effect on October 5, 2018 and only affects heavy vehicles.

See, e.g., Owner-Operator Indep. Drivers Ass'ns, No. 1:19-cv-00086-RLY-MJD, 2019 WL 8955083, at *1-2 (citations omitted).  Therefore, the Owner-Operator litigation involved the 2018 amendment to the Lease.  See id.  In contrast, this case concerns whether the execution of the Lease, in the first instance, "[w]as a [m]aterial [c]hange in [f]act and [l]aw [t]hat [r]emoved the Toll Road from the [MCFT's s]tatutory [d]efintion of [a] "[h]ighway." (See, e.g., Pet'rs' Br. at 4, 9-10 (emphasis omitted).)  See also Bonney, 849 N.E.2d at 476-77 (discussing the circumstances surrounding the 2006 execution of the Lease). Thus, the two cases involve distinct activities that occurred roughly twelve years apart:  namely, the ramifications of the 2006 execution of the Lease and the ramifications of the 2018 amendment to the Lease.  Furthermore, the Motor Carriers' reliance on the Owner-Operator litigation is ironic considering they have stated that the amendments to the Lease "are not critical to [their] arguments" in this case.  (Pet'rs' Br. at 5 n.6.)  Without something more, therefore, the Court will not assume that the differences in the two cases do not matter.  Consequently, the Court finds that the Motor Carriers have not shown that they are entitled to judgment as a matter of law on this basis either.

## CONCLUSION

The Motor Carriers have claimed that the express terms of the 75-year Lease of the Indiana Toll Road demonstrate there is no genuine issue of material fact and that as a matter of law the Toll Road was privately maintained during the 2016 and 2017 tax years.  The Lease, however, was a statutorily authorized public-private agreement that,

16

along with its enabling legislation, established as a matter of law that the Toll Road was a publicly maintained highway throughout the years at issue. Accordingly, consumption of fuel on the Toll Road during the years at issue was subject to the imposition of MCFT, and the Motor Carriers are not entitled to a refund. The Court GRANTS summary judgment in favor of the Department and AGAINST B.L. Reever, Paar, Wilkins.

SO ORDERED this 10th day of January 2024.

Martha Blood Wentworth
Special Judge, Indiana Tax Court

Distribution:
William A. Ramsey, Joshua C. Neal, Paul D. Cullen, Jr., Kathleen B. Havener, Lydia A. Golten, Stephen J. Reen, Sean P. Burke, Hamish S. Cohen